IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | Cr. No. 20-104 |
| ) | |
| PARIS CARTER ) | |

### Opinion and Order on Motion for Judgment of Acquittal or Alternatively, for a New Trial

Presently before the Court is Defendant Paris Carter's "Motion for Judgment of Acquittal, or Alternatively, for a New Trial," pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively. ECF No. 256. The government has filed a Response opposing the Motion, to which Mr. Carter has filed a Reply. ECF Nos. 269 & 270. For the reasons explained below, the Motion will be denied.

Following a jury trial, Mr. Carter was found guilty of Conspiracy to Possess with Intent to Distribute and Distribution of 400 grams or more of Fentanyl and 100 grams or more of Acetyl Fentanyl, from January 2017 to February 2018, in violation of 21 U.S.C. § 846; and Conspiracy to Commit Money Laundering, from June 2017 to February 2018, in violation of 18 U.S.C. § 1956(h). ECF No. 242. This case involved the shipment of illegal controlled substances from China to Pittsburgh, Pennsylvania, where Mr. Carter, who at that time was based in Los Angeles, California, would either pick up the package himself, or arrange for someone else to pick up the package and then deliver it to Mr. Carter. This case also involved Mr. Carter using the proceeds from the sale of the controlled substances to purchase several high-end luxury vehicles from a dealership in Florida.

Mr. Carter argues that there was insufficient evidence of the existence of an agreement between Mr. Carter and any other person to engage in drug trafficking. Similarly, he argues that

there was insufficient evidence of an agreement to support a guilty verdict as to the conspiracy to commit money laundering Count.  Mr. Carter also argues that there was insufficient evidence that he in fact engaged in money laundering.  The Court first addresses Mr. Carter's request for acquittal, followed by his request for a new trial.

I.     **Motion for Judgment of Acquittal**

In considering a Rule 29 motion, the court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt.' " *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).  "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir.2009) (internal quotation marks omitted).  The court must "examine the totality of the evidence, both direct and circumstantial," and "must credit all available inferences in favor of the government." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003).  The court may not "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir.2005).  The court "will only find the evidence insufficient when the prosecution's failure is clear." *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010).

   A. **Drug Trafficking Conspiracy**

Viewing the evidence in favor of the government, in support of proving the charge of conspiracy to possess with intent to distribute and distribution of fentanyl, the government showed that Mr. Carter personally ordered packages of controlled substances (including fentanyl

and acetyl fentanyl[1]) to be shipped from China to various residences in Pittsburgh, Pennsylvania. Mr. Carter paid for the controlled substances, in part, by having various other persons electronically send a portion of the payment to the Chinese supplier, or to other individuals in China, whose names were provided by the Chinese supplier.  The known individuals that performed the electronic payment transactions to the Chinese supplier (Louis Johnson, Nichelle Moore, Michael Symms, Satar Cain, and Lois Robinson), did so with money provided to them by Mr. Carter.

Mr. Carter directed the Chinese suppliers to ship the packages to different names and addresses in Pittsburgh.  Mr. Carter and the Chinese supplier arranged to have the packages shipped without requiring a signature upon delivery.  When Mr. Carter became aware that one of his packages of fentanyl was seized, he told his Chinese suppliers of this fact.  Mr. Carter and the suppliers also discussed manners of shipping that would reduce the likelihood that the packages would be seized before delivery to the address in Pittsburgh.  They discussed changing the originating location of the shipment, as well as shipping fentanyl in smaller amounts to avoid a seizure.  Mr. Carter and his Chinese suppliers also agreed to have the shipping label falsely indicate that the content of the package was something other than illegal controlled substances. Shipping labels from packages containing fentanyl, shipped from China to Pittsburgh, indicated that the contents were, a bracelet, washing powder, polishing powder, beauty products, and organic pigment.

Turning to the arrival of the fentanyl packages in Pittsburgh, the parties stipulated that four such packages were delivered to addresses in Pittsburgh in October 2017.  One package was addressed to Reni Brown at 179 Marsden Street (an address associated with Mr. Carter's

---

[1] When referring to either fentanyl or acetyl fentanyl, the Court will use the shorthand, "fentanyl" for both products.

3

grandmother), one package was addressed to Kelly Sherman at 1225 Grotto Street, and two packages were addressed to Elizabeth Hess at 1100 Lincoln Highway. Kelly Sherman picked up the package sent to her residence and attempted to deliver it to another location, but she was stopped in her vehicle by law enforcement.

Law enforcement intercepted the package sent to 179 Marsden Street and replaced the fentanyl with "sham" and a tracking device. The package was delivered to Marsden Street where law enforcement surveilling the location observed Gina Lewis pick up the package and deliver it to Louis Johnson. Louis Johnson took the package to 1209 Mohler Street. When law enforcement later searched the Mohler Street residence they discovered that Louis Johnson had opened the package, saw the tracking device, and fled. Surveillance video from cameras in the Nolan Court apartment complex showed that Mr. Carter and his vehicle, a Bentley, were in the Nolan Court area at the time of the delivery of the package. After Louis Johnson fled from 1209 Mohler Street, surveillance video captured Louis Johnson and Mr. Carter together in the Nolan Court complex.

Law enforcement discovered substantial evidence of large-scale drug trafficking within 1209 Mohler Street (460 grams of a fentanyl mixture, Super Mannitol, used to dilute fentanyl; packaging materials, stamp bags, and digital scales). The empty stamp bags found in the residence included stamp bags with the names, "Road Rage," New World," and "Bad Yang." Mr. Carter had referred to these exact same stamp bag names in text conversations. A firearm, that looked identical to a firearm Mr. Carter had possessed as shown in photographs of Mr. Carter holding the firearm, was also found within 1209 Mohler Street.

The parties also stipulated that four fentanyl packages were delivered from China to Pittsburgh in December 2017. The packages were delivered to Thomas Washington, Amanda Shaw, Kiheen Trower, and Quaneef Wheeler, each at separate addresses.

Mr. Carter's argument focuses on the lack of evidence showing first-hand observations or knowledge of Mr. Carter personally distributing fentanyl. Similarly, he emphasizes that there was no first-hand evidence showing that Mr. Carter conspired with anyone else. Therefore, he argues that there is no direct evidence to establish that he was involved in a conspiratorial agreement. Mr. Carter argues that his dealings with Chinese suppliers and with Louis Johnson are quintessential buyer-seller relationships.[2]

Mr. Carter posits that the government's case rested on a string of speculative inferences. He further argues that the evidence may have shown that Mr. Carter engaged in illegal drug transactions with Chinese suppliers and with Mr. Johnson, but he argues that the evidence did not establish that these relationships were based on an agreement to conspire to engage in drug trafficking. Furthermore, Mr. Carter points to the lack of evidence linking him to any drug conspiracy. In this regard, he points to the government witnesses who had some involvement with the receipt of the packages shipped from China or had involvement with movement of the packages after delivery. Such individuals testified that they did not know what was in the package shipped to their address, or that they handled. Mr. Carter specifically points out Jackie Simmons' testimony, that the drug trafficking items and associated drug packaging material found by law enforcement inside 1209 Mohler Street were Louis Johnson's or that she did not how the items got there. Mr. Carter therefore concludes that the government's case rested on speculation.

---

[2] The jury was given a "buyer-seller relationship" charge. Tr., Mar. 8, 2024, at 32-33. (ECF No. 261).

Viewing the evidence in a light most favorable to the government, Mr. Carter's argument is insufficient to support a motion for judgment of acquittal. The government asked the jury to find that Mr. Carter was engaged in a drug trafficking conspiracy based on the evidence presented during trial. In light of the trial evidence, it cannot be said that the government asked the jury to speculate that Mr. Carter was involved in a conspiracy. As detailed above, the government introduced a wide range of direct and circumstantial evidence that the jury was entitled to rely upon to conclude that Mr. Carter was engaged in the conspiracy.

It was also the province of the jury to determine the credibility of the government's fact witnesses. Although Mr. Carter relies on testimony from several witnesses, that he argues was favorable to him, the jury was entitled to disbelieve such testimony.

The jury was also entitled to believe that the Chinese suppliers knew exactly what they were doing by shipping such controlled substances, at Mr. Carter's direction, to different names and addresses in the United States. Circumstantial evidence supports a conspiratorial relationship with the Chinese suppliers, based upon the conversations Mr. Carter engaged in with the suppliers, as well as the subsequent conduct of both Mr. Carter and the suppliers. For example,

- the fact that Mr. Carter informed the suppliers that a package of controlled substances shipped from China was seized in the United States,
- the uncommon discussions between a buyer and seller about how to ship packages of controlled substances so that they would not be seized by law enforcement,
- the fact that the packages of controlled substances were each directed to a different name and address in the Pittsburgh area,
- the fact that the suppliers agreed to falsely identify the products containing controlled substance on the shipping label, and did so, and
- the fact that the suppliers agreed to receive electronic payments for the controlled substance products from several different individuals who were not Mr. Carter.

A jury was entitled to regard the above circumstantial evidence as atypical conduct between a buyer and seller.  A jury is also entitled to rely on such evidence to conclude that the Chinese suppliers knew that Mr. Carter was using the Chinese controlled substance products to engage in illegal drug distribution in the United States, that the suppliers were complicit in the conspiracy through their words and actions, and that the Chinese suppliers had an interest in the success of the conspiracy so that they would continue to sell and get paid for their controlled substance product.  From such circumstantial evidence, and the reasonable inferences to be drawn from such evidence, the jury could reasonably conclude that both Mr. Carter and his Chinese suppliers came to an agreement to engage in illegal drug trafficking.

With regard to events in the United States, the jury was entitled to believe that Mr. Carter conspired with several individuals, who were located in the Pittsburgh area, to further the drug trafficking conspiracy.  The evidence showed that packages of fentanyl were delivered to several different residences in Pittsburgh.  Individuals were directed to pick up the packages to deliver them elsewhere.  The evidence specifically showed that Gina Lewis and Louis Johnson engaged in a delivery of one of the packages to 1209 Mohler Street, a residence that law enforcement discovered was setup as a drug trafficking operation.  The evidence further showed that Mr. Carter was observed in the area on the day Gina Lewis and Louis Johnson picked up the package.  After Louis Johnson discovered the package had a tracking device, he fled 1209 Mohler Street, and on the same day surveillance cameras photographed him interacting with Mr. Carter on a sidewalk in the area.  Such information is circumstantial evidence that Mr. Carter was engaged in a drug trafficking conspiracy with Louis Johnson, and perhaps also with Gina Lewis.

The government also introduced evidence demonstrating that Mr. Carter arranged for persons located in the Pittsburgh area to make payments to the Chinese supplier using Mr. Carter's money.  Such evidence provides circumstantial proof upon which the jury could reasonably conclude that the Mr. Carter and Pittsburgh-based individuals came to an agreement on a method of making payments for the fentanyl shipped from China.  Also, the evidence, identifying the Pittsburgh residences to where the Chinese packages were addressed, along with the evidence that various individuals were involved in the pickup of the packages and further movements of the fentanyl packages, provides further support for the jury to reasonably conclude that there was a drug trafficking conspiracy involving Mr. Carter and others.  Mr. Carter purchased drugs from China, arranged for their delivery to Pittsburgh, and Mr. Carter directed the Pittsburgh-based individuals on how and where to move the packages once they arrived in the United States.  The jury could reasonably conclude from such evidence that the Pittsburgh-based individuals were part of a drug trafficking conspiracy with Mr. Carter.

Far from being speculative, Mr. Carter's conviction for conspiracy to possess with intent to distribute and distribution of fentanyl and acetyl fentanyl is properly grounded by both direct and circumstantial evidence.  As already noted, the burden on a defendant, who raises a challenge to the sufficiency of the evidence, is extremely high.  *Gatlin*, 613 F.3d at 380.  Mr. Carter's attacks on the evidence do not show that the "prosecution's failure is clear." *Mercado*, 610 F.3d at 845.  Given the evidence introduced at trial, the Court finds that a rational juror could have concluded that Mr. Carter knowingly was a member of the conspiracy charged in Count One, and that he had the requisite intent to achieve the conspiracy's objective.  Accordingly, Mr. Carter's Motion for Judgment of Acquittal as to Count One will be denied.

### B. Money Laundering Conspiracy

As to the Conspiracy to Commit Money Laundering Count, from his Los Angeles residence, Mr. Carter arranged to purchase three, high-end luxury vehicles from the Auto Toy Store and Specialty Auto Leasing exotic car dealership in Pompano Beach, Florida.[3] In this endeavor, Mr. Carter asked his aunt, Tamara Carter, to place her name on the lease of each vehicle and to perform the necessary paperwork to accomplish the leases. Tamara Carter never used the vehicles. Mr. Carter also enlisted several other individuals to make substantial payments, of less than $10,000 each, to the Florida car dealership for the down payments for each car. Mr. Carter provided these individuals with his own money, typically $9,000, and directed each of them to purchase cashier checks. The individuals would then give the cashier's checks to Mr. Carter, and Mr. Carter, in turn, sent those checks to the dealership. The jury could reasonably conclude that Mr. Carter and the several individuals, whom he enlisted to assist him in changing his illegally obtained drug money into cashier's checks payable to the car dealership, were conspirators in the scheme to launder money.

In addition, Jonathan Franks, the owner of the Auto Toy Store and Specialty Auto Leasing, provided testimony that implied that his business is set up to sell luxury vehicles to individuals who possess illicit funds and want to use such funds to make said purchases. In closing argument, the government made this implication explicit, concluding that the "reason why Paris Carter selected this particular business, [was] because they were willing to deal with people like Paris Carter, drug traffickers, those who wanted these high-end luxury vehicles." Tr. Mar. 8. 2024, at 79. The government further stated that Paris Carter went "all the way down to

---

[3] The high-end luxury vehicles identified in this case were a Bentley Continental (purchase price of $122,697), a Mercedes Benz (purchase price of $92,000), and a Bentley Bentayga (purchase price of $371,000).

Florida to find this particular business to do these transactions remotely and accept payment via cashier's checks under $9,000." *Id.* The government also argued that Mr. Carter could have easily purchased or leased these same vehicles from a dealership in California, but he did not. *Id.*

Counsel for Tamara Carter came to a similar conclusion in his closing argument: "I didn't realize this guy [Jonathan Frank] was going to be so open about doing business with drug dealers." *Id.* at 124. Additionally, Jonathan Frank's testimony, and evidence of communications related to the vehicles with other employees of the dealership, also demonstrated that Mr. Frank and his employees knew for certain that the user of each of the three cars was intended to be Paris Carter, even though they also knew that each car was leased in Tamara Carter's name. From Jonathan Frank's testimony and the evidence showing how the transactions to lease the vehicles occurred, and from the reasonable conclusions one could reach about the dealership's business, the jury could reasonably conclude that Jonathan Frank and Mr. Carter were engaged in transactions designed to launder Mr. Carter's illegally obtained drug money. Therefore, the jury could reasonably conclude that a conspiracy to launder money existed between Mr. Carter, Mr. Frank, and other employees in Mr. Frank's business.

Mr. Carter's arguments in support of his Motion, that the evidence showed that there was nothing secret about the transactions, that the proper government IRS forms were filed by the dealership, and that Mr. Carter was otherwise open about his illegally obtained funds, are similar to the arguments he presented to the jury at trial. The problem with these arguments is that secrecy is not a requirement or an element of conspiracy to commit money laundering. While attempts to keep criminal conduct secret is typical, that Mr. Carter chose to not hide his conduct, or that his effort to hide his criminal conduct was done badly, is not an element of the crime.

Here, a reasonable conclusion to be drawn from the circumstantial evidence was that Mr. Carter indeed did try to conceal his conduct, but he was not completely successful in doing so. In any event, whether and how well Mr. Carter kept his activities secret was a factor the jury could have considered, but secrecy was not required. Again, given the evidence introduced at trial, the Court finds that a rational juror could have concluded that Mr. Carter knowingly entered into a conspiracy to launder money as charged in Count Two, and that he had the requisite intent to achieve the conspiracy's objective. Accordingly, Mr. Carter's Motion for Judgment of Acquittal as to Count Two will be denied.

## II.     Motion for a New Trial

In the alternative, Mr. Carter seeks a new trial pursuant to Federal Rule of Criminal Procedure 33, due to alleged errors. "Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). "A Rule 33 motion may be based on an alleged error or combination of errors at trial, and a court may grant such motion if it finds that errors occurred during the trial, and it is reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." *United States v. Sempf*, No. 2:12CR123, 2015 WL 12911648, at *1 (W.D. Pa. Jan. 28, 2015) (citations omitted). "A convicted defendant has the burden of showing first, that error was committed and, second, that such error was prejudicial to him." *United States v. Neff*, 343 F. Supp. 978, 980–81 (E.D. Pa. 1972). "The

defendant bears the burden of proving that a new trial ought to be granted." *Sempf*, No. 2:12CR123, 2015 WL 12911648, at *1 (citations omitted).

Here, Mr. Carter alleges that six individual errors warrant a new trial; and further, he argues that the combination of errors denied him a fair trial.

### A. Motion to Suppress Evidence Obtained from the Eleven Devices Seized

Mr. Carter argues that his Motion to Suppress was erroneously denied, and that at a minimum, his Motion should be revisited after an evidentiary hearing. Mr. Carter relies on a handwritten note, authored by Postal Inspector Lindsay Weckerly, that was turned over by the government as Jencks materials. Inspector Weckerly was also the author of the December 7, 2018 Affidavit in support of searching the eleven cell phones. The note is dated February 27, 2018, one day before Mr. Carter was arrested by the University of California Los Angeles Police Department in the Central District of California on state charges. ECF No. 256-1. Mr. Carter argues that this note shows coordination between investigators and officers in California and Pennsylvania. He also specifically cites Inspector Weckerly's notes that states: "type a search warrant based on their case," "PC – sexual assaults," and "dump phone." *Id.*

The Court disagrees that Inspector Weckerly's note affects the resolution of Mr. Carter's Motion to Suppress. Long before Mr. Carter was arrested in California, Inspector Weckerly, and other law enforcement officers, had been conducting a wide-ranging investigation into Mr. Carter's drug trafficking and money laundering criminal activities for over a year.

The fact that Inspector Weckerly spoke to an Agent in California about that encounter is unsurprising. Such does not equate to any coordination of efforts, such that the Pennsylvania Affidavit thereby lacked an independent basis regarding the recovery of the devices. Here, it is clear that Inspector Weckerly learned of the cell phones, because law enforcement in California

had arrested Mr. Carter on state charges. The Court does not discern an improper coordination of efforts between California and Pennsylvania law enforcement. Regardless of Inspector Weckerly's note, it was inevitable that law enforcement would arrest Mr. Carter on state charges of false imprisonment and felony sexual battery. When he was arrested, he was found in possession of a loaded handgun and three cell phones. Therefore, based upon Mr. Carter's prior convictions, he was also charged in federal court in California with being a felon in possession of a firearm and ammunition. Incident to his state charges, a search warrant was authorized by California authorities for Mr. Carter's California rental residence. During the search pursuant to said warrant, law enforcement recovered eight electronic devices. Inspector Weckerly did not seek a search warrant for the electronic devices until ten months after Mr. Carter had been arrested in California. All of the electronic devices seized in California were transported to Pittsburgh, as explained in the search warrant later authored by Inspector Weckerly.

Pennsylvania law enforcement is not prohibited from seeking to search devices that another law enforcement unit had properly seized. This Court stands by its prior opinion, in which it stated:

> Officer Weckerly did not rely on the California law enforcement officers' knowledge of the facts and circumstances of the California investigations and arrest of Mr. Carter or on California law enforcement's subsequent seizure of the eleven electronic devices to support the Affidavit for probable cause to *search* the devices. Officer Weckerly set forth the factual events that occurred in California, with respect to Mr. Carter and the seizure of his eleven electronic devices, because such information informs the reviewing magistrate judge of the provenance of the electronic devices sought to be searched.

Op. and Order, Feb. 9. 2024, at 14 (ECF No. 220). That Inspector Weckerly knew of the circumstances relating to Mr. Carter's encounters with California State law enforcement and the subsequent California searches does not amount to an improper coordination between law

enforcement. Accordingly, the Court finds no need to hold an evidentiary hearing and no error in the resolution of the Motion to Suppress.

### B. Motion for a Bill of Particulars as to the Money Laundering Count

Mr. Carter alleges the Court erred by denying his Motion for a Bill of Particulars as to the Conspiracy to Commit Money Laundering charge. Mr. Carter argues that the Court erred in part because the documents turned over by the government, and the theories put forth by the government at trial, still did not provide the defense with the necessary particulars of the charge. He further argues that the defense did not know what theory the government sought until its closing argument, when it is alleged to have settled on a conspiracy to commit money laundering, based upon the conduct involved in obtaining the luxury vehicles.

Initially, the Court notes that Mr. Carter was aware prior to trial of the government's accusation that the money laundering conspiracy involved a governmental focus on the purchase and/or lease of high-end luxury vehicles. Such information was provided in detail in Inspector Weckerly's Affidavit. ECF No. 206-1 at ¶¶ 26-38. During trial, the government also introduced evidence as to money laundering in several ways. The jury could have found Mr. Carter guilty of money laundering, based upon any of the government's theories, or combination of theories, supported by the evidence. The defense had full disclosure of all evidence to be presented by the government. Regardless of the evidence highlighted by the government in closing, the defense was fully informed of all aspects of the evidence germane to the money laundering charge. Having reviewed the briefing and this Court's Opinion on Mr. Carter's Motion for a Bill of Particulars, as well as considering all of the events and evidence presented at trial, the Court finds that there was no error in denying the Motion. All evidence was disclosed, there was no unfair surprise to Mr. Carter.

### C. Alleged *Brady* Violation related to Jailhouse Phone Calls

Under *Brady*, the government is obligated to disclose to the defense exculpatory evidence favorable to the defendant where such evidence is material to the defendant's guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963). Shortly before trial, the government discovered recordings of two recent phone calls, initiated by Mr. Carter from jail to an unidentified male. The gist of the government's purpose in introducing the phone calls was to show Mr. Carter's consciousness of guilt. In each phone call, Mr. Carter asks the person on the line to contact specific government witnesses to dissuade them from testifying, or to instruct them to testify that they do not remember the events.

The recordings and transcriptions of the phone calls were entered into evidence to show consciousness of guilt. The government disclosed the two audio recordings with accompanying transcripts, plus information that the phone calls were made under another inmate's personal identification number (PIN), and that Mr. Carter did not use his own PIN. Mr. Carter argues that the government failed in its *Brady* obligations because it did not disclose the name of the inmate whose PIN Mr. Carter used, and because the government did not explain how it determined that Mr. Carter used another inmate's PIN. The defense argues that, given that the phone calls could not otherwise be traced to Mr. Carter, and that the identity of the persons Mr. Carter talked to was unknown, the defense should have been given such information.

The Court concludes that the there is no *Brady* violation. Counsel for Mr. Carter does not challenge that it was Mr. Carter who made the phone calls.[4] Therefore, Mr. Carter already knew

---

[4] *See* Tr. Mar. 6, 2024, at 7-8 (referring to the fact that the government's witness list had not been disclosed at the time, defense counsel states, "Mr. ("Carter [was] saying this [on the phone calls]"); 8 ("What Mr. Carter says in the first call. . . ."); and 8 ("with the second phone call -- Mr. Carter talks about a lawyer in there").

15

the identity of the inmate whose PIN he used, or that he knew the identify of anyone else who may have given him said inmate's PIN number. Similarly, Mr. Carter knew the identity of the persons he called.

That leaves only the issue of how the government discovered the phone calls. The defense conclusorily argues that such information would permit the defense to raise chain-of-custody issues. This argument is not just conclusory, but it is also highly speculative. The origin of the phone calls has not been challenged. There is no question that the phone calls originated from Butler County Jail and were made by Mr. Carter using another inmate's PIN. Although the defense hints that the identity of the recipients of the phone calls may have assisted the defense, the identity of the individual(s) was known to Mr. Carter. Indeed, Mr. Carter is the one who made the phone calls. The defense's arguments do not persuade the Court that such identity information is truly *Brady* material. Therefore, the Court concludes that such information is not properly classified as Brady material.

Finally, even assuming that the requested information were *Brady* material, it would not result in granting a new trial. Under *Brady*, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* Given the totality of the evidence supporting the jury's guilty verdict, had the government disclosed the material the defense now asks for, the result of the proceeding would not have been different. Accordingly, the Court finds no error as to the alleged *Brady* violation.

### D. Motion to Exclude Rap Lyrics on Cell phone

Next, Mr. Carter argues that the Court erred in denying his Motion in Limine to Exclude Evidence of Rap Lyrics.  Mr. Carter argues that the introduction of the rap lyrics at trial was error, because it deprived Mr. Carter of his constitutional right to freedom of expression, denied him a fair trial, and violated Federal Rules of Evidence 801 and 403.  He argues that the introduction of such evidence was error, because the government did not lay a proper foundation or provide sufficient verification that the lyrics originated from Mr. Carter.  Mr. Carter also singles out a specific lyric reference, which states, "I did 3 years on a bunk but I just made 300k in a week," as being impermissibly prejudicial, in part, because the lyric implies that Mr. Carter had spent time in prison.  Finally, he argues that the lyric is impermissible character evidence under Rule 404(b).

The Court sees no error with its prior ruling that permitted the government to introduce Mr. Carter's rap lyrics.  Such evidence did not violate Mr. Carter's First Amendment rights.  *See* Order, Mar. 5, 2024, at 2-3, ECF No. 235.  As to the provenance of the rap lyrics, the government demonstrated that the lyrics were discovered within two of Mr. Carter's iPhones.  The government explained that it intended to introduce the lyrics to corroborate the fruits of the charged conspiracies, such as the accumulation of wealth, possessing a Bentley, and having power and prestige.  Moreover, the government argued that the time frame, for when the lyrics were written, overlap with the time frames of the conspiracies at issue.  Thus, the government sufficiently demonstrated that the lyrics, found on Mr. Carter's own iPhones, were written by Mr. Carter.  Thus, the lyrics were properly admitted.

In response to the lyric, "I did 3 years on a bunk but I just made 300k in a week," the government states that, during trial, it did not highlight the phrase, "I did 3 years on a bunk."

The government argues that this specific lyric was introduced to show that Mr. Carter "making 300k in a week" as circumstantial evidence to establish that, to raise such funds, he was engaged in illegal drug activity. The government also did not highlight, insinuate, or argue that "bunk" referred to incarceration. The government's focus was upon the evidence of Mr. Carter composing lyrics about making $300,000 in one week, at a time when he had no lawful means of obtain that much money. In the context of this evidence as presented, the Court concludes that the introduction of the rap lyrics, including the above phrase, was not substantially outweighed by any danger of unfair prejudice. Accordingly, the Court finds that there was no error in denying the Motion in Limine and admitting the rap lyrics.

### E. Error in Denying Request to Preclude Evidence of a Lavish Lifestyle

During trial, the government introduced photographic and video evidence of Mr. Carter "showing off substantial amounts of cash, holding guns, and embracing an overall lavish lifestyle – adorned with designer clothes, expensive jewelry, and high-end cars." Def. Mot. 23, ECF No. 256. Mr. Carter argues that such evidence was needlessly cumulative and highly prejudicial. Such evidence was relevant to the government's efforts to show that Mr. Carter had no legitimate source of income, yet he possessed great amounts of United States currency, which he used to support a lavish lifestyle that required a substantial amount of wealth. The evidence was also relevant in other ways, as detailed in the government's brief. There was no error in admitting such evidence.

### F. Error in Admitting Jail House Calls into Evidence

Mr. Carter argues that the audio recordings of Mr. Carter's jailhouse calls should not have been admitted, because they were not properly authenticated and they were highly

prejudicial. Before the audio recordings were played, the government asked Postal Inspector Lindsey Weckerly about the jailhouse phone calls:

> Q. Now as part of your investigation, did you, in preparation for trial, interview a woman named Jacqueline Simmons?
>
> A. I did.
>
> Q. Now based upon that interview, did you seek authorization to review the jail calls of Paris Carter in the weeks prior to trial?
>
> A. I did.
>
> Q. And in terms of jail calls, is there a personal identification number associated with a particular inmate?
>
> A. Yes. Each inmate is assigned their own number.
>
> Q. And did you review jail calls of Mr. Paris Carter in the weeks prior to trial?
>
> A. I did.
>
> Q. And were you able to recognize his voice?
>
> A. Yes.
>
> Q. And were there times when Mr. Carter was using a personal identification not associated with him but with someone else?
>
> A. Yes.
>
> Q. And for two of those calls, have we downloaded them and prepared them for presentation at trial.
>
> A. Yes, we have.
>
> . . .
>
> Q. Approximately when would these calls have been, ma'am?
>
> A. Around February 15th to 17th.
>
> Q. So two or three weeks before the trial?
>
> A. Correct.

Tr. Mar. 6, 2024, at 232-233, 238, ECF No. 262.  The Court concludes that the government properly authenticated the jailhouse calls, and there was no error in admitting them.

The Court agrees with government, that the prejudice from the jailhouse calls is due to Mr. Carter having chosen use another inmate's PIN, used that PIN to call a third party, and having asked that third party to contact and influence certain individuals who were likely to testify at trial.  Under these circumstances, the prejudice resulting from the introduction of the jailhouse calls at trial is not *unfair* prejudice.  Accordingly, the Court concludes that there was no error in admitting the jail house calls into evidence.

### G. Cumulative Effect of Errors

As the court found no errors based on the above defense arguments, there is no cumulative effect of errors to analyze.

### III. Conclusion

For the reasons explained above, the Court will deny both Mr. Carter's motion for judgment of acquittal pursuant to Federal Rules of Criminal Procedure 29 and Mr. Carter's alternative motion for a new trial pursuant to Federal Rules of Criminal Procedure 33.

### ORDER

AND NOW, this 18th day of September 2024 it is hereby ORDERED that Paris Carter's Motion for Judgment of Acquittal, or Alternatively, for a New Trial, ECF No. 256, is DENIED.

_____
Marilyn J. Horan
United States District Judge